Okay, our next case is number 16, 2497 Converse, Inc. v. ITC. Mr. Reck. Good morning, Your Honors. This appeal is about the Commission's over-reliance on a flawed survey to strip trademark protection from one of the most iconic product designs in American history. It's also about the Commission's improper reliance on third-party use, divorced from the consumer's perspective. Both of these are legal errors and both require reversal of the Commission's secondary meaning determination. I have a threshold question. I frankly find this incredibly confusing about what we're supposed to do with the Commission's test and how we're supposed to review it. But I understand for the secondary meaning test, there are seven factors that the Commission makes and that those are factual findings, right? Yes, Your Honor. And so we would review their findings on that for substantial evidence. Correct. Their ultimate finding as to whether there's secondary meaning or not. Is that also a factual determination that we review for substantial evidence? I believe, yes, it is the ultimate determination. But there are legal issues associated with the sub-factors that we believe were legally erroneous. And if I may... Do you think, do you agree that those seven factors are the factors that we should be employing? Well, to the extent it's the Commission's precedent, yes. Other factors are considered by courts as well. So for example, an additional factor that courts consider probative of secondary meaning is enforcement efforts. That isn't one of the factors... What have they said about it? Have we blessed the seven factors? I don't believe so. Not specifically, no. And are there other regional circuits that do not bless those seven factors? I think generally speaking, the regional factors are in parallel with the factors. However, the weight that they're given is substantially different. So for example, here... You mean in terms of the significance of survey evidence? Exactly, Your Honor. Yes. Are there any other courts that give such substantial weight to survey evidence? There are, but I believe the majority of courts do not give substantial weight to survey evidence. Survey evidence, as with all other evidence, is but one factor in the ultimate determination of secondary meaning in most circuits. Let me ask you a housekeeping issue. We've got the registered mark and we have the common law mark. Yes, Your Honor. So what is at issue here in appeal? You're appealing both determinations? So yes, Your Honor. Let's start with the registered mark. We believe that because of the registration, the registration provided... But we don't have to go through the registered mark yet. Okay. I want to know, do you have to prevail on both for an injunction to be permissible? So, no. I believe that to the extent we prevail on the registered mark, that's an issue of validity. But we need to establish secondary meaning as of the date of first infringement, which was fixed by the ID and confirmed in the Commission's decision as 2003. So to the extent, for purposes of infringement, I believe we have to establish secondary meaning as of 2003. But the validity of the registration is a separate issue as well. There's this complexity about whether we should be determining secondary meaning at the time of the infringement or the time of the registration. And in Chippendales, I assume you're familiar with that. Yes, Your Honor. It talked about inherent distinctiveness being determined as of the date of the registration. Is it possible that the test should be that you have to find secondary meaning at the time of the infringement and that if you want to have the presumption of validity, there has to be secondary meaning at the time of the registration? Does that make sense? Well, I think to the extent this registration is for a product configuration, so it can't be inherently distinctive under the... No, no, I understand that. But I'm talking about in terms of secondary meaning. In order to get the presumption that would flow from the registration, there would have to be a finding that there was secondary meaning at the time of the registration, right? So if I may, there has to be a finding that there's presumed to be secondary meaning at the time of the registration based on the certificate of registration itself. So there is, as a matter of law, secondary meaning. In this case, because of the Cold War... That would be refuted by showing that there wasn't secondary meaning at the time of the registration, right? Yes, Your Honor. So, I mean, this is a very spongy concept, unlike patent law, which sometimes seems confusing, but in contrast to trademark law here, it seems pretty clear. That's a scary thought. Okay, go ahead. So, if I may focus on the first legal error. The Commission committed legal error when it relied on a survey that asked the wrong question. The survey expert in this case that the Commission relied on was Sarah Butler, and Ms. Butler asked a recognized question when she should have asked an associate question. Now, why does that matter? It's significant because a recognized question is directed to a fame issue, whether a mark is famous. Under 15 U.S.C. 1125, a mark is famous if it is widely recognized by the general consuming public. But this court has said in Tone Brothers, quote, all that is necessary to establish secondary meaning is that the consumer associate the trade dress with a single, albeit anonymous, source. It's a lower threshold. Now, it's all...  But what did Ms. Butler say at trial about the use of the recognized term? Well, first of all, she admitted that recognize is a question that's directed to testing whether a mark is famous. And that's at Appendix 009876. She also admitted that fame is a much higher standard. And that's the same citation. When she asked whether she'd ever used the term recognize in a secondary meaning survey before, she said no. I've never used it before, notwithstanding the fact that I have conducted 25 to 30 secondary meaning surveys in the past. When she was asked to explain why she used the term and she was pressed on this issue, she had no answer. And her writings confirm that associate is, in fact, the right question to ask for purposes of secondary meaning. So if we throw out her survey evidence, given what the ALJ did with respect to the other survey evidence, are we just saying there's no survey evidence? Yes, Your Honor. That's exactly right. And it's important to note that another survey that she conducted using the same recognize question was thrown out. Now, what did the other, in this case, in this case, I can get you. On that ground? Yes, the use of recognize was improper in connection with the use of the stimuli. Yes, that's exactly right. She didn't, he didn't think. This is in the AJ's decision? Yes. Where? If I may have a moment. If I may, Your Honor, may I get that site to you in a moment? Yeah. Let me bring you, or a lot of different issues here. Let me bring you to the prior use, the exclusive use issue. Yes. And if I understand, one of the contentions that you're making is that some of these prior uses on which the commission relied, were not, in fact, prior uses of the entire mark. That some of them, for example, on the bumpers didn't have the diamond. And yet, at the same time, I see that in connection with infringement, you argued that shoes that don't have the complete mark infringe. How are we to reconcile those two arguments? Yes, Your Honor. There may be circumstances where shoes that don't have the identical combination of elements can be considered for purposes of testing secondary meaning. So the test seems to be substantially similar, right? Yes, Your Honor. And when you get to the infringement issue, the question, the issue of identity of the marks is but one factor. So they don't have to be identical if other factors tip in favor of a finding of likelihood of confusion. The citation to the ALJ's decision where he rejected half of Ms. Butler's survey is Appendix 79. And it goes through 80 as well. And what was his explanation for why it was okay in one survey and not okay in the other to use the same improper language? So if my recollection serves me, he determined that- Where do we find his determination on this page? It's- It starts- Yeah, it starts on the second paragraph of page- I don't see where he says that the use of the word recognized is improper. I thought he just had a problem with her choice of control. So I believe that he actually- So yeah, at page 82, the ultimate conclusion I believe is, While only a small number of survey respondents articulated this problem, these comments provide support for the proposition that the use of the word recognized was problematic in this context. Right, but he says, I think his words are the use of the word recognized is not improper per se, but must be evaluated in the context of the survey. Yes, and that's what I said earlier, which is the use of recognized in connection with the survey stimulus in the other survey is what caused the judge to disregard the survey. But then he, in the context of the other survey, decided that it wasn't improper. Right, and I believe the same problems are present, and if I may, I can explain why. So recognized is a question that is asking whether you have seen something before, and associates a question that asks whether you associate something in your mind with something you've seen before. And here, the survey participants were shown basically a demonstrative exhibit that was in our complaint. It wasn't the mark. The mark is described in the registration, and I can cite the page for you at A015131, and the mark is used in connection with a shoe. So if you look at the broken lines in the registration, it shows where the mark is. Here, the survey expert asked, do you recognize a part of the mark taken out of context floating in space? And Congress has never shown that mark floating in space like the survey expert did. So when you ask the question, do you recognize this, of course consumers are going to say they haven't seen it. They don't recognize it. Are you talking about the survey that he didn't let in? I'm talking about the survey that he did let in. Okay. Yeah. So the survey that he didn't let in asked the recognized question with a made-up shoe. The survey that he let in asked the recognized question with a part of the design, not the mark, because the mark's in connection with the midsole of a shoe. So there was no shoe. It's, do you recognize this design floating in space, or this image, as a brand or brands of sneakers? So the consumer who, the participant in the survey who saw this was never going to be able to say, yeah, I recognize this, because that specific stimulus had never been used before. Well, isn't your argument really a problem with that drawing, not the word recognize? I believe it's both, because, and here's why. If you ask the question of a consumer, do you associate this? Let me ask you, if hypothetically you had a drawing that you agreed with, what would be wrong with saying recognize? It asks the heightened standard. It asks whether you've seen it before, and that's not the test for secondary meaning, and that's not what this court has said in Tone Brothers. All you need is an association which is a lower standard. But apart from your argument about the use of the word recognize, which we've spent quite a bit of time on, is there any legal error in the board's decision, and if so, what is it? So apart from the survey, the legal error, so what the board did is it said, I'm adopting what the commission said, what the ALJ said, insofar as four elements of secondary meaning are concerned. Massive amounts of sales, longstanding use, massive amounts of advertising, and massive amounts of unsolicited media given to the issue, more so than probably any other product in American history. I'm going to accept that, okay? What's the legal error? So the legal error is if you actually reverse on either the survey, you throw the survey out, then you've got one factor, which I haven't addressed yet, but we believe was analyzed under the improper legal framework, then you've got one factor that supports no secondary meaning. No, no, no, but just tell me what the legal errors are. Just briefly summarize. Okay. The legal error is under this court's in-ray steel building authority, no one secondary meaning factor can be determined. Too much weight to the survey. Correct. Well, too much weight to one factor. Okay. One factor can't be determined. Apart from that, what other legal errors? Legal error on the survey, which we've mentioned, and legal error in analyzing third-party use, absent and divorced from consumer context. And does that mean is it just because they didn't look at the consumer context or is it because they didn't look at the consumer context as of 2003? So as of 2013 and as of 2003. So the proper legal analysis in short form is you've got to look at the relevant time. How do we figure out what's the relevant time? Let's go to the 2003 date. We don't take a snapshot, do we, on that day and say this is the relevant time. We have to look at some period preceding that, don't we, for exclusivity of use. So under Braun, so for exclusivity of use, if you look at exclusivity of use, you can look at the five years preceding the application because under 1052. Wait, I think I'm asking you about the wrong. That's okay. No, go ahead. Okay, sure. So to summarize the legal argument with respect to third-party use, you've got to look at the right time. So it's certainly 2013 because of the presumption of validity. And at that time under – Braun says you look at it at the time of the infringement. No, no. So if I may, so you first look at it as of 2013. And as of 2013, the presumption of validity requires that the challenger carry both the burden of production and burden of persuasion. Braun says, okay, if you want to ensnare infringers, you have to show secondary meaning as of the date of first infringement. So that would be 2003. So converse bore the burden of proving secondary meaning as of 2003, and the challengers bore the burden of proving invalidity of the registration in 2013. Now here's the legal error. You have to look at the right time and you have to look at the relevant consumer. So it's 2013, certainly, and 2003 for purposes of infringement. Then you have to look at who's the average consumer. You keep saying just these dates, but what's the relevant period of time? Well, so the relevant period of time can be the period, as I said, five years prior to the filing of the application. Where do we get five years from? So 1052-F says that, and that's the basis of the application. Incontestability? No, I do not. But that has to do with the right to the registration, right, in the first instance? Yes. So if something didn't have secondary meaning, say, in 1940, something can acquire secondary meaning for the relevant population of consumer, correct? Absolutely, because secondary meaning is a dynamic concept, yes. Absolutely. And that's why if you look at third-party uses back in the 20s and the 30s and the 40s and the 50s, you can't say that they had an impact on somebody in 2013, particularly when you're talking about the average consumer of converse, Chuck Taylors, was a 15- to 30-year-old. The chief marketing officer from Converse said, our sweet spot is the 16-year-old to 26-year-old, and then a little bit older. Now, does Converse sell to a broader range of people? Yeah, absolutely. But if you look at the 15- to 30-year-olds, if I may finish the answer briefly, Your Honor, 15- to 30-year-olds, they're not going to know about 20s, 30s, 40s, 50s, 1970s, and 1980s catalogs because they just weren't exposed to them. Some of them don't know what happened yesterday, but that's a separate question. That's true. All right. I think we're out of time here. We'll give you two minutes for rebuttal. Thank you. Mr. Jardine. Thank you, Your Honor. Good morning. May it please the Court. Commission found no secondary meaning as to the CMT design, supported by substantial evidence, in accordance with the law. I think I'll just dive right into rebutting. There seems to me to be a problem in the sense that this prior use evidence that they relied on is missing some of the features of the mark. And if I understand the cases, there has to be a finding of substantial similarity, and I don't see that in the Commission's decision. Am I missing something? I believe so, Your Honor. There's numerous examples throughout the tremendous record of evidence. There are quite a few examples where the mark is used, but the Commission also seems to be relying on examples where the complete mark is not used. For example, the diamond shape on the bumper. Right. In accordance with case law, as long as there's reasonable, substantial evidence to support the Commission's determination, even if some evidence may detract from it, it should be affirmed. I think that's what we have here. We have numerous significant examples. We have going throughout the whole length of use that Converse asserted, coming from 80 years ago in 1932 to the present. That's part of the problem here is the mark is registered much later than that. Correct. And at the time of registration, of course, the Trademark Office determined that it had acquired secondary meaning, and it was entitled to a mark. Correct. And at that point, they were looking at a particular population of consumer. How are we supposed to say that what happened in 1920 is reflective of what someone who was a consumer at that point in time, at the point of registration, would understand? Right. I think it's reflected, again, by the record evidence. Again, there's a moving target that Converse has kind of moved throughout this whole litigation. I mean, of course, they were in love with survey evidence. We can go to our brief on page 58. Well, put aside the survey, I'm still confused about what time period we're looking about for this historical evidence. I mean, I don't see how something from 1920 is relevant at all to a consumer in 2003. What time period from 2003 back are we looking at? Your friend suggested five years, although I don't think he got to the exact reasoning for that. But it can't be that a consumer in 2003, secondary meaning determination is based upon something that happened 100 years before he lived, can it? Yeah. If you go to the Record Evidence Commission opinion, it expressly states from the 1920s to the present. It says that a multiple number of times. Right, but that's the attack. That's one of the legal errors that is being asserted on appeal. So the fact that the commission said that doesn't mean it's right necessarily, right? Well, they're asserting that we didn't consider all the evidence, and we did consider all the evidence. We considered the seven factors. They're asserting that you considered improper evidence. Correct. Great. So if it's an improper time range, if they look back way too far, then how do we know that the evidence in the proper time frame would still support or they would still come to that conclusion? Again, you can look at this survey evidence that suddenly they don't like anymore. Don't talk about the survey evidence. I want to talk about the use. Is there use within a recent time frame that would support your argument? Yes. What? You can go to the 2011 Converse Owner of Keds Agreement, where they agreed and the owner of Keds expressively warranted that they were the exclusive distributor, provider, marketer of shoes that embody the CMT design. That was exactly the same design on the same shoe product marketed to the same consumer class. And we have numerous examples of that throughout the record, again, from 1932 to the present. Putting aside Keds, and there are separate arguments relating to Keds, but the only other uses were the actually infringing uses, right? Right, but if you go against the case law. But that's the whole point. If there are people copying, that sort of indicates that there's enough of a meaning to this design that people want to copy it. Again, I urge the court not to play their game. There's seven factors. There is separate factors for deliberate copying. Well, if we were to say every time someone copies a mark, that destroys secondary meaning, then there would never be the ability to have an infringement of a mark, right? Right, but we're not saying that. We're saying that's a separate factor. And if you go to Levi Strauss, it says specifically that you cannot say that, oh, these are infringers, these are irrelevant. The court said this is relevant because, again, it goes towards acquired distinctiveness, which was not found here if you go to the record evidence. Well, we presume acquired distinctiveness. I mean, it's the commission's, it's the other side's burden to establish that it didn't exist. It's not Congress's burden to establish that it does. You hear the record evidence was abundant that it overcame that presumption. So the record, the abundant record evidence is the KEDS agreement? That's the prime example, but it's a multitude of examples here in the record. Anything during the relevant time frame, during the time frame, assuming the time frame is 2003 forward? I mean, you have, again, you have, well, I mean, you can connect the dots here. You have 1988, you have Sears fall into catalog, an appendix page. Okay, that's not my question. Is there anything in the 2003 forward time frame? Assuming that's the time frame we're looking at, this is a hypothetical. Again, I'm trying to connect the dots here. You have 1988 alongside advertising in J.C. Penney fall winter catalog. It was 38187, volume four of the appendix. If we're saying that the focus should be on 2003 and 2013, how far in advance is prior use evidence relevant? Five years, it seems to be what Congress is saying. Or is it more than that? It's the entire length of use that the asserted trademark owner is alleging. Here they're alleging, again, throughout the record, 1932 to the present. That's what we looked at, 1932 to the present. We found numerous examples, again, more recently. This is a hypothetical. If all of the prior use had been from 1920 to 1940, and no customers, and let's accept these are younger customers, even if some of those people are alive, no customers ever would have been able to see that prior use. You still think that's relevant? Again, the commission opinion says 1920 to the present. Let me see if I can straighten this out. If I understand what you're saying is that they're claiming a period of exclusive use going back to the 1920s, and to defeat the exclusivity period that they claim, you're saying that it's relevant that other people were using it in that same period where they claim exclusive use, right? Right. Again, that's the whole meaning of secondary meaning is that a consumer recognizes that as coming from one source. If we were going to demark a time period for five years going before 2013, I guess we would have to say that the exclusive use factor that Converse says favors it would have to be limited to the same time period. Am I understanding that correctly? I think the court should look at the entire- You're telling us we should, but if we disagree with you, because I don't see how it makes any sense that we are looking at something from the 20s for secondary consideration in 2003. Again, there's record evidence. You can tell me there's record evidence, but we're not talking about the evidence. We're talking about the proper legal standard. These factors are a mess anyway, but if we're looking at historical usage on whether a current consumer would know that there's secondary meaning, it just can't be the case that something from 1920 is relevant to that determination as a matter of law. Again, all the case laws look at the entire length of use that's asserted. But exclusivity of use and acquired distinctiveness are two different things, right? To get a mark, you have to establish that you've had exclusive use for five years before the time of the application for the mark, right? You have to show that you possess secondary meaning, which is- But what you're saying is that to the extent they're claiming exclusivity of use going way back to the 20s, that can be defeated by use by other people going back to the 20s, right? Right. But I'm saying basically that a combination of these two factors, exclusivity of use and the low consumer recognition right here, defeats their claim of secondary meaning. Again, we have recent use. Again, from 2011, owner of KEDS, Commerce Agreement. We have their own internal memo in 2005 at Appendix Page 26237, which is Volume 2. Again, where they show their shoe surrounded by competitor's shoes, the majority of which have the same exact, again, CMT design. That might go to whether or not they carefully policed their mark. But at the point in time that they have a mark and the point of that picture was to say everybody's trying to copy us. Right, but they say they wish they had a design patent. They say they wish they had a trademark because they realized they couldn't get a trademark because they don't possess secondary meaning. Again, there's other numerous recent use. You have 2001, the testimony of Cartalis at Appendix Pages 4076, 8 to 70, where she talked about the introduction of Skecher's slip-on shoe, which again was the same CMT design on the same shoe product marketed to the same consumer class. Again, these are the alleged infringer's respondents, right? So you want us to assume that every time someone infringes that it destroys secondary meaning. Right, but again, I encourage the court to go to the case law, which says, typically, and if you go to Levi Strauss, it typically says, the court rejected the trademark owner's attempts to dismiss this evidence because any such uses were infringes, knowing that such arguments are irrelevant, where there was a question as to whether the alleged mark acquired distinctiveness through an extended period of substantially exclusive and continuous use by the trademark owner. This is exactly, again, the facts here are very similar to Levi Strauss. Very similar to Echo Travel. We had distribution of advertisements here. They were just in the thousands and hundreds. Here we have, again, 80 years of advertisements by three major retailers, again, combined with this low consumer survey evidence, which, again, was a moving target for them. When they lost on that, they said, oh, recognition. Again, if you go to Appendix Pages of the Butler Witness Statement, particular Butler Witness Statement, Appendix Pages 40319, where they asked about the recognition issue, and it was just about recognition of design as a design of a brand or company. Again, this is the same elements they had in their complaint, where they asserted that it's probably the most widely recognized design in the history of footwear, and this iconic symbol of Converse brand in Appendix Page 385 in Volume 1. So they took their exact decision at the time. Thank you, Your Honor. Thank you, Judge Jardine. Let's see. Mr. Fazzella? Yes, sir. Good morning. Mark Fazzella from Fish & Richardson on behalf of New Balance, Walmart, and Q Liquidation, the intervener respondents. I'd like to address, Judge O'Malley, your question about the effect of the respondents' alleged infringing sales and whether that can affect a finding of secondary meaning. That presumes the outcome of the case. What we have here is only a presumption of secondary meaning as of the date of the federal registration, 2013. So only as of that date is Converse presumed, that's a rebuttable presumption, presumed to have secondary meaning. That means that the respondents' sales prior to that date, even if the mark's identical, cannot be infringing because the mark that is used is not a mark. There's no secondary meaning. That's why we deal with the common law mark. Correct. But again, this is where I have a problem with the confusion. It's like you want to use the evidence that relates to the common law mark to wipe out the registered trademark. They want to use the evidence that relates to the registered trademark to protect their common law mark. And I think you're both confusing the questions. Let me see if I can clarify. It's a continuum. Judge Hughes, you asked, what's the relevance of a shoe made in 1920? The relevance of the shoe made in the 1920 to a case in 2015 is that its use didn't begin and end in 1920. It continued for the intervening 80 years. There were experts in footwear history, fashion, and marketing, all of whom did volumes of research looking at the marketplace, looking at the industry, looking at sales, all of whom testified that there wasn't a period during which, that 80-year period, that Converse was the exclusive user. So why does the continuous use during that period matter? It matters because this particular design combination constitutes a style of footwear. It's a type of shoe. Go ahead. I'll be quick. I get that, but the problem is that I'm not so sure that the evidence you have supports. I mean, if it were true that it was consistent use by multiple parties throughout the period, that would be fine. Let me ask you a hypothetical. If the only use by other people was from 1920 to 1940, and in 1940, all the other people using this dropped out, and for the next 70 years, Converse was the only company using this mark, and therefore everybody associated that mark only with Converse, and therefore would have acquired secondary considerations, could you use that 1920 to 1940 evidence to rebut secondary considerations? In that narrow hypothetical, no, but that's not our fact. Well, isn't the answer that to the extent that Converse was claiming that it had exclusive use from 1920 to 1940, that would be relevant, right? For that very narrow period, but I understood the hypothetical to be a question about protectability in more current periods. I think the problem is, at least as I see it, is that the earlier evidence certainly is relevant to defeat the contention of exclusive use for a long, long period. Correct. You have to be able to refute that evidence of use by others in the earlier period, but once you get outside of that factor, then it seems to me the earlier use becomes more problematic. It's all relative, right? The earlier use is useful to rebut the notion that there's been exclusive use for a substantial period of time. That's not true, factually. Right, but to get the registration, they didn't have to establish exclusive use for a long period of time. They might have said it, but they didn't have to. Correct, there was a five-year window prior. It's just a five-year period of time, and something that was not necessarily used exclusively over historically can become an exclusive use and have acquired secondary meaning, and that's the whole point, is that you look going forward, you look at the relevant point in time. And let's look at that relevant point in time. You asked my colleague from the ITC what's the more current evidence. The more current evidence, let's go five years back from the application, which is the mid-2000s. In 2000, we have the footwear dictionary identifying a sneaker as a Keds that has the identical designation as claimed as a copyright here, or trademark here. Identical. So, this isn't a patent case where the fact that it's in a dictionary is dispositive. What that means, though, is that when the folks putting out that dictionary said, what does a sneaker look like? They picked Keds, and they picked Keds. But that's a licensed use? That wasn't a licensed use. Well, the dictionary wasn't a licensed use, but the Keds... The Keds did not license its use from Converse. They ran in parallel. Much like PF Flyers, my client, which is owned by New Balance, sold shoes beginning in the 1940s with a small gap during the 1980s to the late 1990s, continuously. They sold those shoes continuously during the period prior to the acquisition of the registration. So, PF Flyers sales are not infringing sales. PF Flyers shoes look like PF Flyers. They don't look like Converse. Because they're the very same shoes that they've been selling since the 1940s. So, there are PF Flyers sales that predate this small window that precedes the application. There are Skechers sales that predate this small window prior to the application. And those sales are in the millions. And we know Keds also sold. We know that the footwear dictionary included Keds as the definitive example of what a sneaker is. And it has the same combination. Didn't ALJ specifically find that that did not necessarily affect the determination of whether the primary association was with Converse? Could you say that another way? Didn't ALJ specifically find that despite that, that would not alter the question of whether the primary association, which is what we're supposed to be looking at, associated with a singular source, was still with Converse? Standing alone, it is not enough. But put in this volume of material evidencing substantial third-party use during the period at which Converse claims substantially exclusive use, it's another piece of evidence. Standing alone, it's not enough. But there's substantial evidence. I could address some of the Court's questions on surveys if you have any interest. Mr. Chu. Thank you. Good morning. Morgan Chu on behalf of Skechers. I was going to address the APA and the Dr. Pham arguments, but instead I'm going to try and address the questions that the panel has been asking. Here's the evidence of a recent time, and I'll start at 2003 and I'll bring it forward. 2003, Skechers introduces Twinkle Toes. It has continuously sold Twinkle Toes. What's some of the evidence? In 2010, within that five-year period, an executive at Converse, a Mr. Seehafer, was told that Skechers was outselling Converse four to one. This is in that five-year period. 2012, Converse internal presentation calls Chuck Taylors a generic shoe and identifies the fact that there's an oversaturation of the market. That first document, the outselling four to one, it's in the appendix at 47. Genericness has never been an issue in this case. Excuse me? Genericness has not been an issue in this case. Correct. It's not an issue now before the court, but it's not meant to be a legal word. It's in this particular document where they're saying there's a saturation of the market. That means it's not just a few uses, and this is against the background where... Let me make sure I get the sites out. The first one was 47668. The next one was 47554. In 2013, Mr. Seehafer, the Converse executive, wrote, Two years ago, we recognized the gains by Skechers, 47669. In another document, internal to Converse, Skechers have taken a piece out of us, 47667, and that Skechers was cranking out big numbers for Twinkle Toes. Same document. Another document, Mr. Seehafer had a long conversation with Ken Moody regarding the big hits that Converse was taking from Skechers. I'm only looking at the recent period, 2003, everyone agrees it's relevant, all the way to the present. The last point is this. Did the board, I mean, did the ITC cite to any of this? The answer is yes, and witness statements discussing this as well. Where? It's in appendix 26 through about 35, where they're discussing exclusivity of use. There is a discussion of older uses there, but at the top of appendix 28, the commission decision talks about uses from the 1930s to the present, and then there's a long string cite of very substantial evidence, which includes that broad period of time. Now, the courts recognize that out of the seven factors, only one is direct evidence. The other six factors are circumstantial evidence. The one factor that is direct evidence from decisions of various courts is survey evidence, because that's the evidence where you're asking actual consumers. You're asking actual consumers whether you associate or recognize or however the questions are being worded. Okay. I think, Mr. Hsu, we're out of time. Thank you. Thank you. Mr. Rankin, two minutes. Yes, thank you, Your Honor. We're talking about the Chuck Taylor here, and I want to start with Skechers because Skechers is one of the primary reasons we are here. The question isn't whether the use is exclusive. It's whether the use is substantially exclusive, and under this court's Kichler authority, you don't consider inconsequential uses and you don't consider infringing uses, particularly if they're derived from the trademark owner's rights. What happened in 2003? Okay. Skechers introduced the twinkle toe shoe. They sold 27,000 units of twinkle toe shoes. Converse, in that year, sold 7.7 million pair of shoes. So that's 0.3% of the shoes. For every thousand pair of Converse shoes on the street, you saw three pair of Skechers shoes. Is that going to impact the mark's ability to serve as a source identifier? No. It's inconsequential. What's the real issue here, though? The real issue is from 2008 to 2010, while Converse was enforcing its rights, sending out 120 cease and desist letters, engaged in a massive, massive anti-counterfeiting campaign, which is the most egregious form of trademark infringement, we have Skechers documents at appendix 017470. Skechers designed documents that refer to the twinkle toes as the twinkle toes slim Converse copy. They're a copy. Now, what do they do in their e-mails? They use the word Converse with an asterisk so that in lawsuits like this, it's going to be hard to find out who they were trying to copy. How do we know that they were trying to trade off the substantial goodwill in the Chuck Taylor? Because they copied to the millimeter. They copied the bumper to the millimeter. They copied the line stripes to the millimeter. They were trying to trade off of Converse's goodwill. They were infringers, and that's the reason in part why we're here. So they don't count in the calculus of whether Converse was substantially exclusive. If I may address the KEDS issue. I think we're out of time. Thank you. Thank both counsel. The case is submitted.